# Supreme Court of Florida

_____

No. SC15-1538
_____

**EMMA GAYLE WEAVER, etc.,**
Petitioner,

vs.

**STEPHEN C. MYERS, M.D., et al.,**
Respondents.

[November 9, 2017]

LEWIS, J.

This case involves a Florida constitutional challenge to the 2013 amendments to sections 766.106 and 766.1065 of the Florida Statutes. Generally, the statutes pertain to invasive presuit notice requirements that must be satisfied before a medical negligence action may be filed, as well as an informal discovery process that accompanies that presuit notice process, and the amendments at issue here authorize secret, ex parte interviews as part of the informal discovery process. The First District Court of Appeal upheld the constitutionality of these statutory amendments in Weaver v. Myers, 170 So. 3d 873, 883 (Fla. 1st DCA 2015).

Weaver then petitioned this Court for review.[1]  Because the district court expressly declared a state statute valid, this Court has discretionary jurisdiction to review the decision.  See art. V, § 3(b)(3), Fla. Const.  We accept that jurisdiction.

## STATUTORY BACKGROUND

Since 2011, before filing a medical negligence action in Florida, a claimant must satisfy statutory requirements, which include conducting a presuit investigation process to ascertain whether there are reasonable grounds to believe that the defendant medical provider was negligent, and that the negligence resulted in injury to the claimant.  § 766.203(2)(a)-(b), Fla. Stat. (2016).

Following that investigation, a claimant must give each prospective defendant presuit notice of intent to initiate litigation and make certain disclosures. § 766.106(2)(a), Fla. Stat. (2016).  The notice must disclose, where available, a list of all health care providers seen by the claimant for the injuries complained of and all known health care providers seen during the two-year period prior to the alleged act of negligence.  Id.  Furthermore, a medical malpractice claimant must furnish

---

1. An amicus brief by the Florida Justice Association has been filed in support of Weaver.  Amicus briefs by the State of Florida, the Florida Justice Reform Institute, and the Florida Hospital Association/Florida Medical Association/American Medical Association have been filed in support of Dr. Myers.

all medical records that the presuit investigation expert relied upon in signing an affidavit indicating a good-faith basis to believe a valid claim exists.  See id.

In addition, the presuit notice must include an executed authorization form that is provided in section 766.1065 of the Florida Statutes.  Id.  That executed authorization form is titled "Authorization for Release of Protected Health Information."  § 766.1065, Fla. Stat. (2016).  By executing the authorization form in compliance with the statutory presuit notice requirement, the claimant is required to authorize the release of protected verbal and written health information that is potentially relevant to the claim of medical negligence in the possession of the health care providers listed in the notice disclosures.  § 766.1065(3)B.1.-2., Fla. Stat.  However, this authorization is not a blanket authorization—it excludes health care providers who do not possess information that is potentially relevant to the claim.  § 766.1065(3)C.  Nevertheless, the claimant is required to name these providers and provide the dates of treatments rendered by others.  Id.

As part of this presuit machinery unique to medical malpractice claims, "the parties shall make discoverable information available without formal discovery."  § 766.106(6)(a), Fla. Stat.  Under this informal discovery, a prospective defendant may require a medical malpractice claimant seeking redress to: (1) give an unsworn statement; (2) produce requested documents, things, and medical records; (3) submit to a physical or mental examination; (4) answer written questions; and

(5) authorize treating health care providers to give unsworn statements. See

§ 766.106(6)(b), Fla. Stat. The statutory scheme further provides, however, that

"work product generated by the presuit screening process is not discoverable or

admissible in any civil action for any purpose by the opposing party." §

766.106(5), Fla. Stat. But, failure to participate in informal discovery "is grounds

for dismissal of claims or defenses ultimately asserted." § 766.106(6)(a), Fla. Stat.

### AMENDMENTS AT ISSUE

While it retained the scheme described above, in 2013, the Legislature added

secret, ex parte interviews to the list of informal discovery devices to which a

medical malpractice claimant seeking redress must consent:

> Interviews of treating health care providers.—A prospective defendant or his or her legal representative may interview the claimant's treating health care providers consistent with the authorization for release of protected health information. This subparagraph does not require a claimant's treating health care provider to submit to a request for an interview. Notice of the intent to conduct an interview shall be provided to the claimant or the claimant's legal representative, who shall be responsible for arranging a mutually convenient date, time, and location for the interview within 15 days after the request is made. For subsequent interviews, the prospective defendant or his or her representative shall notify the claimant and his or her legal representative at least 72 hours before the subsequent interview. If the claimant's attorney fails to schedule an interview, the prospective defendant or his or her legal representative may attempt to conduct an interview without further notice to the claimant or the claimant's legal representative.

§ 766.106(6)(b)5., Fla. Stat. (emphasis added); Ch. 2013-108, § 3, at 5, Laws of

Fla. Thus, that plain language requires that, upon request by the prospective

defendant, the medical malpractice claimant must arrange for an interview between his or her treating health care providers and the prospective defendant or legal representatives of such defendant within fifteen days of the request. Without providing any limitation on the number of interviews, the plain language further provides for arranging subsequent interviews with 72-hours' notice. However, if at any time the medical malpractice claimant's attorney fails to schedule a requested interview, then the prospective defendant or his lawyers may unilaterally and without notice schedule the claimant's treating health care providers for such an interview without any notice to the claimant whatsoever. Nothing prevents multiple attempts at securing such interviews.

Further, the statutorily mandated authorization form was also amended and makes clear that the prospective defendant may interview the claimant's treating health care providers ex parte in secret, without the claimant or the claimant's attorney present:

> This authorization expressly allows the persons or class of persons listed in subsections D.2.-4. above to interview the health care providers listed in subsections B.1.-2. above, <u>without the presence of the Patient or the Patient's attorney</u>.

§ 766.1065(3)E., Fla. Stat. (emphasis added); Ch. 2013-108, § 4, at 7, Laws of Fla. However, because "[t]his authorization expressly allows the persons or class of persons listed in subsections D.2.-4. above to interview," the authorization requires a medical malpractice claimant to expose health care providers to such clandestine,

ex parte interviews not only with the prospective defendant, but also with a broad set of parties, including related insurers, expert witnesses, attorneys, and support staff:

> 2. Any liability insurer or self-insurer providing liability insurance coverage, self-insurance, or defense to any health care provider to whom presuit notice is given, or to any health care provider listed in subsections B.1.-2. above, regarding the care and treatment of the Patient.

> 3. Any consulting or testifying expert employed by or on behalf of (name of health care provider to whom presuit notice was given) and his/her/its insurer(s), self-insurer(s), or attorney(s) regarding the matter of the presuit notice accompanying this authorization.

> 4. Any attorney (including his/her staff) employed by or on behalf of (name of health care provider to whom presuit notice was given) or employed by or on behalf of any health care provider(s) listed in subsections B.1.-2. above, regarding the matter of the presuit notice accompanying this authorization or the care and treatment of the Patient.

§ 766.1065(3)D.2.-4., Fla. Stat.

The Legislature did not amend the statute without some expression of its intent. Specifically, in 2013, the Legislature added a third express purpose for the release of the protected health information: "Obtaining legal advice or representation arising out of the medical negligence claim described in the accompanying presuit notice." § 766.1065(3)A.3., Fla. Stat.; Ch. 2013-108, § 4, at 6, Laws of Fla. Before the amendments, the stated purpose of the mandatory authorization was twofold—to facilitate the investigation and evaluation of the

- 6 -

claim, or to defend against any litigation arising out of the claim. § 766.1065(3)A.1.-2., Fla. Stat. (2012); Ch. 2013-108, § 4, at 6, Laws of Fla.

Further, as was true before the 2013 amendments, it remains true today that these conditions imposed by the Legislature are nonnegotiable. Specifically, "If the authorization required by this section is revoked, the presuit notice under s. 766.106(2) is deemed retroactively void from the date of issuance, and any tolling effect that the presuit notice may have had on any applicable statute-of-limitations period is retroactively rendered void." § 766.1065(2), Fla. Stat. (2016); see also generally § 95.11(4)(b), Fla. Stat. (2016) ("An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence . . . ."). Thus, as the decision below correctly recognized, a claimant now cannot institute a medical malpractice action without authorizing ex parte interviews between the claimant's health care providers and the potential defendant. Weaver, 170 So. 3d at 877.

## FACTUAL AND PROCEDURAL BACKGROUND

Faced with the expanded disclosure requirements, Petitioner Emma Gayle Weaver (Weaver), individually and as personal representative of the estate of her late husband Thomas Weaver (Thomas), filed an action against Respondent Dr. Stephen C. Myers for declaratory judgment and injunctive relief with regard to the

2013 amendments on the date they became effective. Weaver contended that Dr. Myers provided care to Thomas that allegedly led to his injury and death. Relevant here, Weaver contended that the 2013 amendments violated the right of access to courts and the right to privacy under the Florida Constitution.

With regard to the right to privacy claim, the trial court granted in part Dr. Myers' motion to dismiss and dismissed Weaver's privacy claim. The trial court first concluded that an estate cannot assert any privacy rights on behalf of a decedent because such rights under the Florida Constitution absolutely terminate upon death and essentially are retroactively destroyed. The court then held that even if Weaver could assert Thomas' privacy rights, the claim should still be dismissed because a constitutional privacy challenge can only be asserted to protect against a government entity or actor even though it is obvious that a state statute is authorizing the invasion here.

With regard to the access to courts challenge, on June 24, 2014, the trial court granted Dr. Myers' motion for summary judgment. The trial court reasoned that the predecessor statute to section 766.106 was held to be valid under the applicable provision of the Florida Constitution. See Lindberg v. Hosp. Corp. of Am., 545 So. 2d 1384, 1386 (Fla. 4th DCA 1989), approved 571 So. 2d 446 (Fla. 1990). The court then concluded the addition of the secret ex parte interviews do

not represent a material change sufficient to render the statute an impermissible burden on access to courts.

On appeal, the First District affirmed. Weaver, 170 So. 3d at 883. With regard to access to courts, the First District stated that "[a] statute which merely imposes a condition precedent to suit without abolishing or eliminating a substantive right must be upheld in the face of a constitutional challenge unless the statute 'create[s] a significantly difficult impediment to . . . right of access.' " Id. at 882 (quoting Henderson v. Crosby, 883 So. 2d 847, 854 (Fla. 1st DCA 2004) (quoting Mitchell v. Moore, 786 So. 2d 521 (Fla. 2001))). The district court determined that the signing and serving of the mandatory authorization as part of the presuit process does not "abolish or eliminate" any substantive right, and concluded that "all that is imposed is a precondition to suit, in addition to those that are already in existence under chapter 766." Id. It then stated:

> Though [Weaver] is correct that the amendments to the authorization for release of protected health information now require the claimant to expressly authorize ex parte interviews between former health care practitioners with information relevant to the potential lawsuit and the potential defendant, we find that like the presuit notice requirement itself, this is a reasonable condition precedent to filing suit, and, thus, does not violate her right to access the courts.

Id. at 882-83.

With regard to the privacy challenge, the district court, unlike the trial court, addressed this claim on the merits and concluded that "any privacy rights that

might attach to a claimant's medical information are waived once that information is placed at issue by filing a medical malpractice claim. Thus, by filing the medical malpractice lawsuit, the decedent's medical condition is at issue." Id. at 883 (citations omitted). The district court further noted that prior to the 2013 amendments, potential claimants were already required to disclose and produce relevant medical records to the defense during the presuit process. Id. The court below did not acknowledge or even address the concept of non-relevant matters and privacy rights related thereto.

Therefore, the district court upheld the constitutionality of the statutes. This review follows.

## ANALYSIS

Weaver contends that the Legislature's passage of certain amendments to sections 766.106 and 766.1065 of the Florida Statutes are unconstitutional for several reasons. First, Weaver contends that the amendments violate the right to privacy explicitly provided for in the Florida Constitution. Relatedly, Weaver also contends that placing a prerequisite condition on her action for wrongful death requiring the release of Thomas' medical records and the facilitation of ex parte, secret presuit interviews with Thomas' medical providers violates the right to access to courts. Because these issues are questions of Florida constitutional law,

our review is de novo. <u>Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n</u>, 838 So. 2d 492, 500 (Fla. 2003).

The United States Supreme Court has explained that the United States Constitution does not mention the right to privacy, but that it is a pervasive right touching on many aspects of life and the right of privacy finds its roots throughout the Bill of Rights and in the Fourteenth Amendment:

> The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as <u>Union Pacific R. Co. v. Botsford</u>, 141 U.S. 250, 251 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment; in the Fourth and Fifth Amendments; in the penumbras of the Bill of Rights; in the Ninth Amendment; or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty," are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage; procreation; contraception; family relationships; and child rearing and education.

<u>Roe v. Wade</u>, 410 U.S. 113, 152-53 (1973), <u>holding modified by</u> <u>Planned Parenthood of Se. Pa. v. Casey</u>, 505 U.S. 833 (1992) (internal citations omitted).

While the federal right to privacy is pervasive and is revealed by judicial interpretation, we need not rely on federal law but look only to the Florida Constitution, which <u>explicitly</u> provides a right to privacy:

Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein.

Art. I, § 23, Fla. Const. (1980). This provision was added by Florida voters in 1980 and remains unchanged.

We have explained that the right to privacy in the Florida Constitution is broader, more fundamental, and more highly guarded than any federal counterpart:

This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.

Winfield v. Div. of Pari-Mutuel Wagering, 477 So. 2d 544, 548 (Fla. 1985); see N. Fla. Women's Health & Counseling Servs., Inc. v. State, 866 So. 2d 612, 634-35 (Fla. 2003). The right of privacy "ensures that individuals are able 'to determine for themselves when, how and to what extent information about them is communicated to others.' " Shaktman v. State, 553 So. 2d 148, 150 (Fla. 1989) (quoting A. Westin, Privacy and Freedom 7 (1967)).

Specifically relevant here, we have held in no uncertain terms that "[a] patient's medical records enjoy a confidential status by virtue of the right to

- 12 -

privacy contained in the Florida Constitution . . . ." State v. Johnson, 814 So. 2d 390, 393 (Fla. 2002). We have further recognized that "[t]he potential for invasion of privacy is inherent in the litigation process." Rasmussen v. S. Fla. Blood Serv., Inc., 500 So. 2d 533, 535 (Fla. 1987).

This would not be the first time that a Florida court has balanced a decedent's constitutional right to privacy over information occurring during the person's lifetime against the right to access to that information in litigation. In Antico v. Sindt Trucking, Inc., 148 So. 3d 163, 164 (Fla. 1st DCA 2014), which also involved a wrongful death action, the administrator of an estate raised a constitutional privacy challenge to discovery of the contents of the decedent's cell phone. Specifically, the case involved a fatal automobile accident and the wrongful-death-action defendant filed a motion for permission to have an expert inspect the decedent's cellphone for data from the day of the accident—data pertaining to "use and location information, internet website access history, email messages, and social and photo media posted and reviewed on the day of the accident." Id. The administrator of the decedent's estate "objected to the cellphone inspection citing the decedent's privacy rights under the Florida Constitution." Id. The trial court ultimately granted the motion to examine the cell phone, but recognized the decedent's privacy interests and set very strict parameters for the expert's confidential inspection. Id. at 164-65.

Notwithstanding the strict parameters set by the trial court in Antico, the administrator of the estate filed a petition for writ of certiorari with the First District asserting that the trial court's order departed from the essential requirements of law by not granting stronger protections.  Id. at 165-66.  In exercising certiorari jurisdiction over the petition, the First District held that the irreparable harm component of its jurisdiction in that case was satisfied "because irreparable harm can be presumed where a discovery order compels production of matters implicating privacy rights."  Id.  Thus, by exercising its certiorari jurisdiction, the district court necessarily held that the decedent had an enforceable constitutional right to privacy in the litigation context.

In denying relief from the highly limited grant of discovery over the cell phone's contents, the Antico court noted that the trial court had adequately accounted for the decedent's privacy right:

> The record here indicates that the trial court closely considered how to balance Respondents' discovery rights and the decedent's privacy rights.  The order highlighted the relevance of the cellphone's data to the Respondents' defense and it set forth strict procedures controlling how the inspection process would proceed.
> . . . .
> The other side of the equation—the countervailing privacy interest involved with the discovery of data on a cellphone—is also very important. . . .  But we are satisfied that the order adequately safeguards privacy interests under the circumstances here where Petitioner was given the opportunity, but advanced no alternative plan.

- 14 -

Id. at 166-67 (emphasis added). For emphasis, the Antico court performed its review of the discovery objection pursuant to the constitutional privacy right of the decedent. Id. at 164. ("Citing the privacy provision, article I, section 23, of the Florida Constitution, and the rules of civil procedure, the personal representative of Tabitha Antico's estate (Petitioner) objects to an order entered by the trial court . . . Petitioner objected to the cellphone inspection citing the decedent's privacy rights under the Florida Constitution." (emphasis added)).

Consistent with Antico, the decision below did not hold that Thomas did not have a constitutional right to privacy in his protected medical information. The district court specifically rested its privacy analysis on waiver grounds:

> It is well-established in Florida and across the country that any privacy rights that might attach to a claimant's medical information are waived once that information is placed at issue by filing a medical malpractice claim. See, e.g., Barker v. Barker, 909 So. 2d 333, 337 (Fla. 2d DCA 2005); Andreatta v. Hunley, 714 N.E.2d 1154, 1157 (Ind. Ct. App. 1999). Thus, by filing the medical malpractice lawsuit, the decedent's medical condition is at issue.

Weaver, 170 So. 3d at 883. At no point did the district court hold that the decedent did not have a right to privacy. See generally id. Indeed, to the contrary, its waiver analysis was an implicit acknowledgement of that privacy right, as one cannot waive a right he or she does not have. No other basis was offered for the First District's holding as to the privacy issue.

Thus, we now make explicit what the decision below and <u>Antico</u> necessarily implied—in all litigation contexts, a decedent does not retroactively lose and can maintain the constitutional right to privacy that may be invoked as a shield in all contexts, including but not limited to medical malpractice cases, against the unwanted disclosure of protected private matters, including medical information that is irrelevant to any underlying claim including but not limited to any medical malpractice claim.[2]  Death does not retroactively abolish the constitutional protections for privacy that existed at the moment of death.  To hold otherwise would be ironic because it would afford greater privacy rights to plaintiffs who survived alleged medical malpractice while depriving plaintiffs of the same protections where the alleged medical malpractice was egregious enough to end the

---

2.  In a related context, application of existing limits and exemptions to access to information by the public bolsters this conclusion.  For instance, in the context of the federal Freedom of Information Act, the families of deceased astronauts from the Challenger space shuttle explosion were allowed to claim an exemption for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  <u>New York Times Co. v. Nat'l Aeronautics & Space Admin.</u>, 782 F. Supp. 628, 630 (D.D.C. 1991).  In another context, it is well-established law that the right to privacy survives death.  Florida recognizes both a statutory and common law right of publicity.  § 540.08, Fla. Stat. (2016); <u>see, e.g.</u>, <u>Cason v. Baskin</u>, 20 So. 2d 243, 245 (Fla. 1944).  The right of publicity is a corollary right derived from the right to privacy that allows a person to control the use of his or her name and likeness.  Section 540.08, Florida Statutes, authorizes the surviving spouse of a decedent to enforce the decedent's publicity rights for up to forty years.  <u>See</u> § 540.08(1), (5)-(7).  Thus, it is clear that the right to privacy survives a person's death, is not retroactively destroyed by death, and remains enforceable in tort law by the decedent's family members for decades.

lives of those plaintiffs.  This is an outcome that our Florida Constitution could not possibly sanction.  Cf. Estate of Youngblood v. Halifax Convalescent Ctr., Ltd., 874 So. 2d 596, 603-04 (Fla. 5th DCA 2004) ("Thus in a case such as this where the suit was filed before the nursing home resident's death, all deprivation of Chapter 400 rights, including those resulting in the death of a resident but not exclusive of those, should survive the death of the nursing home resident.  A contrary interpretation would encourage nursing homes to drag out litigation until the nursing home resident dies—not an impractical solution given the age and state of health of most nursing home residents." (internal citation omitted)).  Thus, we reiterate that Thomas and his estate, even after his death, maintained a constitutional right to privacy concerning matters that occurred prior to his death, and that privacy may be invoked as a shield to maintain the confidence of his protected information, including but not limited to medical information.

But Dr. Myers contends that Thomas does not have a cognizable right to privacy because his constitutional rights retroactively totally vanished upon his death, and even if not, Weaver lacks standing to assert his privacy rights. Specifically, Dr. Myers strings together the following language in support of this sweeping contention:

> An individual's right to privacy is personal and dies with the individual.  Williams v. City of Minneola, 575 So. 2d 683, 689 (Fla. 5th DCA 1991).  "[E]ven where a constitutional right to privacy is implicated, that right is a personal one, inuring solely to individuals."

- 17 -

> Alterra Healthcare Corp. v. Estate of Shelley, 827 So. 2d 936, 941
> (Fla. 2002).  Thus, such privacy rights "may not be asserted
> vicariously." Sieniarecki v. State, 756 So. 2d 68, 76 (Fla. 2000).
> Moreover, this Court has declared unequivocally: "[W]e begin with
> the premise that a person's constitutional rights terminate at death."
> State v. Powell, 497 So. 2d 1188, 1190 (Fla. 1986).

Answer Br. at 45.

However, Dr. Myers' use of quotes out of context and incorrectly expanded arguments to suggest a retroactive absolution of the basic privacy right is both misleading and without effect.  The very briefest of review of those cases reveals that it is Dr. Myers' argument that is without life, not Thomas' constitutional right to privacy.  For example, Dr. Myers referred this Court to Williams, 575 So. 2d at 689, for the proposition that a decedent has no right to privacy.  However, Williams involved an action for damages arising from the alleged invasion of privacy resulting from the release of autopsy photos.  Id. at 689-90.  Thus, Williams involved the tort of invasion of privacy on conduct occurring after death rather than the invocation of the constitutional right of privacy before death occurred.[3]

Likewise, Sieniarecki, 756 So. 2d 68, is wholly inapposite.  Sieniarecki did not involve shielding information from disclosure.  Instead, Sieniarecki involved a

---

3. Moreover, even in this distinct context, the Williams court recognized that there are certain exceptions in which a decedent's next of kin may properly bring an action for invasion of privacy.  575 So. 2d at 689.

facial challenge by a defendant found guilty of neglect of a disabled adult, the disabled adult being her mother.  See id. at 71-72.  Thus, Sieniarecki contended that "because her mother had the right to refuse medical treatment, [she] cannot be convicted of neglect for failing to provide proper medical attention."  Id. at 76.  We held that she could not assert a defense based on the privacy right of her mother to refuse medical treatment in that case because "constitutional rights are personal in nature and generally may not be asserted vicariously."  Id.  However, invoking another person's constitutional right to refuse medical treatment not for that person's benefit, but to protect against criminal liability is quite different from invoking another person's right to privacy to protect disclosure of that person's constitutionally protected information for that person's benefit.  This is even more the case where the person has no effective avenue to preserve the right himself or herself.  Indeed, in a footnote to the statement Dr. Myers quotes out of context, we recognized that there are other situations or "exceptions" that are more akin to the situation here:

> A recognized exception to this rule applies where enforcement of a challenged restriction would adversely affect the rights of non-parties, and there is no effective avenue for them to preserve their rights themselves.  Cf. Stall v. State, 570 So. 2d 257, 258 (Fla. 1990) ("[a]ssuming that the petitioners [who were alleged vendors of obscene materials] have vicarious standing to raise their customers' privacy interest").  This principle has been extended to apply where it is the petitioners who "stand to lose from the outcome of this case and yet they have no other effective avenue for preserving their rights" than by raising the constitutional rights of non-parties.  Jones v. State,

- 19 -

> 640 So. 2d 1084, 1085 (Fla. 1994) (recognizing petitioners' vicarious standing to assert the claimed privacy rights of the underaged girls with whom they had sexual intercourse).

Id. at 76 n.3 (emphasis added).

Powell, 497 So. 2d 1188, also provides no support. There, the petitioners challenged a statute authorizing medical examiners to remove corneal tissue from a cadaver for use in a corneal transplant. Id. at 1190. Thus, in Powell, the issue of privacy was raised with regard to conduct that occurred after the person's death, not during his or her lifetime as is the case here with Thomas Weaver's medical care. Therefore, the quoted out of context language is presented in an attempt to bolster the incorrect argument. Still, in Powell, we also recognized that even with regard to rights after death, "[i]f any rights exist, they belong to the decedent's next of kin." Id.

Likewise, the statement in Alterra that "even where a constitutional right to privacy is implicated, that right is a personal one, inuring solely to individuals" is taken out of context because it involved a challenge to the standing of an employer to assert an employee's constitutional privacy rights. Alterra, 827 So. 2d at 941. Here again the argument advanced failed to include the context in which the statement was made.

Finally, Dr. Myers further refers us to Nestor v. Posner-Gerstenhaber, 857 So. 2d 953 (Fla. 3d DCA 2003), in which the administrator of an estate sought to

- 20 -

enforce confidentiality agreements entered into between a decedent and his employees, signed just before his death. In <u>Nestor</u>, the district court referenced <u>Williams</u> in the contractual context and stated, "Privacy rights are personal and die with the individual." 857 So. 2d at 955. However, in the very next sentence, the district court reasoned that in the confidentiality agreement "there is no provision that requires confidentiality after Posner's death." <u>Id.</u> Thus, <u>Nestor</u> is wholly inapposite as it pertains exclusively to a contractual privacy claim rather than a constitutional privacy claim. Indeed, <u>Nestor</u> does not even contain any mention or reference to the Florida Constitution, let alone the explicit fundamental constitutional right to privacy. Similarly unsupportive, Dr. Myers also refers us to <u>Loft v. Fuller</u>, 408 So. 2d 619 (Fla. 4th DCA 1981), which is yet another invasion of privacy case that fails to even mention the Florida Constitution, but rather is focused on the common law right to privacy and its use as a sword, rather than as a shield.

Dr. Myers further contends that "the concept that an individual's constitutional privacy rights expire upon death is well accepted across the country," and refers this Court to cases from various federal courts. Answer Br. at 46. However, not one of those cases supports that statement because every one of those cases involves conduct that occurred <u>after</u> the death of the person whose constitutional rights were at issue. <u>See</u> <u>Silkwood v. Kerr-McGee Corp.</u>, 637 F.2d

- 21 -

743, 749 (10th Cir. 1980) ("We agree with the Ninth Circuit that the civil rights of a person cannot be violated once that person has died. It is clear then that the FBI agents could not have violated the civil rights of Silkwood by cover-up actions taken after her death.") (emphasis added) (citations omitted); Whitehurst v. Wright, 592 F.2d 834, 840-41 (5th Cir. 1979) ("Here, the events of the alleged cover-up took place after Bernard Whitehurst had been shot and killed. . . . The question presented in the court below and in this court was whether events occurring after his death constituted a deprivation of her son's constitutional rights for which plaintiff has stated a claim.") (emphasis added) (footnote omitted); Ravellette v. Smith, 300 F.2d 854, 857 (7th Cir. 1962) ("These cases are inapposite because they are concerned with a violation of the rights of a living person. In the instant case, decedent was dead when the sample was taken.") (emphasis added); Helmer v. Middaugh, 191 F. Supp. 2d 283, 285 (N.D.N.Y. 2002) ("As the allegations concerning Lt. Lisi are limited to conduct occurring after the death of B. Helmer, plaintiff's amended complaint does not allege a viable cause of action against him.") (emphasis added). Indeed, some of those cases even support Weaver's position. See Whitehurst 592 F.2d at 840 ("No allegation was made that any conspiracy to kill Whitehurst or to cover up the event existed before the shooting took place.") (emphasis added); Helmer, 191 F. Supp. 2d at 285 ("In addition, because the proposed Second Amended Complaint alleges no additional facts to

demonstrate Lt. Lisi's involvement prior to the death of B. Helmer, it does not cure this fatal defect as to Lt. Lisi.") (emphasis added).

Therefore, not a single case that Dr. Myers has advanced stands for the broad, incorrect proposition that a person's constitutional rights pertaining to conduct occurring during the person's lifetime are retroactively destroyed upon death. Indeed, if Dr. Myers' position were correct, there would be absolutely no protection and no one to assert the protection. We must be ever vigilant as we consider invasions into the fundamental rights of our citizens, particularly when faced with flawed legal arguments. Today we specifically address privacy, which is included among our most cherished rights such as speech, religion, to be free from searches and seizures without a warrant or permissible exception, and the right to due process. Surely, the reflex of any concerned jurist upon consideration of an invasion of fundamental rights would be to protect our citizens as required by our Bill of Rights. Dr. Myers' contention here is that a person loses all of those rights upon death. Such a holding would render those rights hollow, chilling the daily operation of them on people as they navigate their lives from moment to moment.

As discussed above, in Florida, the right to privacy is no less fundamental than those other rights and is even more closely guarded in some respects. Thus, the slippery slope Dr. Myers invites this Court to slide down is even more perilous

with regard to the right to privacy. Indeed, just the potential for retroactive destruction of the right to privacy robs the life of that very protection due to the chill it would cause. If we were to follow Dr. Myers' argument that a person experiences the loss of privacy applicable while living upon the change in status from alive to dead, then the secrets of that person's life, including his or her sexual preferences, political views, religious beliefs, views about family members, medical history, and any other thought or belief the person considered to be private and a secret are subject to full revelation upon death. Theoretically, there would be no need for justification for such intrusions or revelations of a person's secrets, not even a rational basis. Therefore, what would follow from allowing a retroactive destruction of the fundamental right to privacy is a reality in which ultimately anyone could rummage at any time, without limitation, through every detail of every citizen's most private information.

Here, the right to privacy is being used as a limited shield from ex parte discovery and not as a sword to initiate a civil action. Thus, none of those cases asserted by Dr. Myers addressed the right of privacy <u>before</u> death in the specific context at issue here. While this may appear subtle, it is a very critical distinction. Failing to note this distinction, Dr. Myers' selective readings of case law has led him to a misdiagnosis of Thomas' right to privacy upon his death, a right that remains quite alive.

The inquiry does not end here though. Dr. Myers also asserts that Weaver lacks standing to assert a right to privacy here. In Antico, the district court assumed that the estate had standing to assert the decedent's privacy interests. 148 So. 3d at 168 n.2 ("We needn't resolve Respondents' additional contention that Petitioner lacks standing in this case to assert the decedent's constitutional privacy rights. The trial court didn't pass on this question. And, as discussed above, relief isn't warranted even if we assume (as this opinion does) that Petitioner can assert the decedent's privacy rights."). Here, in the decision below, the district court did not resolve the question of standing, and simply held that Weaver had waived the right to privacy by filing a medical malpractice wrongful death action. See Weaver, 170 So. 3d at 883.

Given that the issue of standing must be considered in this case, unlike the Antico case, we address Dr. Myers' challenge to Weaver's standing. Despite the district court's holding of waiver below, that waiver holding itself provides recognition and a basis for our holding here. Holding that Weaver waived the right of privacy by filing the wrongful death action implies not only that Thomas Weaver had a right to privacy in the litigation context that could be waived, but also that Emma Weaver, the administrator of his estate and his wife, had standing to waive such rights. It follows that if she had standing to waive the right to privacy here, she likewise had standing to assert that privacy right. Similarly, if a

- 25 -

decedent has a constitutional privacy interest under the Florida Constitution in the context of discovery in litigation, as the Antico court recognized, then someone must be able to assert that privilege.

Florida's Wrongful Death Act establishes the personal representative of a decedent's estate as the sole party that may file a decedent's cause of action for wrongful death. The statute provides in pertinent part:

> The action shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, caused by the injury resulting in death. When a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate.

§ 768.20, Fla. Stat. (2016); see Roughton v. R.J. Reynolds Tobacco Co., 129 So. 3d 1145 (Fla. 1st DCA 2013) (A wrongful death action may be brought only by the personal representative for the benefit of the decedent's survivors and estate.); Fla. Emergency Physicians-Kang & Assocs., M.D., P.A. v. Parker, 800 So. 2d 631, 633 (Fla. 5th DCA 2001) (same); Benson v. Benson, 533 So. 2d 889 (Fla. 3d DCA 1988) (Decedent's parents were without standing to file a wrongful death action where decedent's wife, not decedent's parents, served as administratrix of decedent's estate.). Thus, if the right exists, which we conclude it does, then it most assuredly must be capable of being advanced. Cf. In re Guardianship of Browning, 568 So. 2d 4, 12 (Fla. 1990) ("Indeed, the right of privacy would be an empty right were it not to extend to competent and incompetent persons alike.").

With regard to wrongful death actions, the administrator of the estate may certainly assert that right because he or she is the only person who has standing to file a wrongful death action in the first place.  Moreover, Weaver's status as wife may further entitle her to assert the right.  Cf. Powell, 497 So. 2d at 1190 ("If any rights exist, they belong to the decedent's next of kin.")  Based upon the foregoing, Weaver, as personal representative of Thomas' estate and his wife, clearly has standing to challenge the provisions at issue by presenting the constitutional right to privacy in Thomas' protected medical information.

Dr. Myers further asserts that Weaver has necessarily waived all constitutional rights to privacy in this case by filing a claim of medical malpractice.  However, the anatomy of such a waiver under Florida law is clear.  Although a claimant may necessarily waive privacy rights to the medical information that is relevant to a claim by filing an action, this does not amount to waiver of privacy rights pertaining to all confidential health information that is not relevant to the claim.  See generally Poston v. Wiggins, 112 So. 3d 783, 786 (Fla. 1st DCA 2013) (granting certiorari petition and quashing trial court order requiring production of post-accident medical records because "[u]nlike the pre-accident pharmacy records which may be relevant, the post-accident medical records are entirely irrelevant"); McEnany v. Ryan, 44 So. 3d 245, 247 (Fla. 4th DCA 2010) (granting certiorari petition and quashing trial court order which denied petitioner-

defendant's objections to motion to compel; "In this case, whether defendant was impaired by a mixture of the drug Ritalin and alcohol at the time of the accident would be a relevant issue. Determining whether petitioner had a current prescription for Ritalin seems to us to be relevant to that inquiry. It is equally apparent to us, however, that most of the medical records sought likely have no relevance to that inquiry, and no link was shown at the hearing."); Barker, 909 So. 2d at 338 ("By failing to provide for an in camera inspection of [the petitioner's] medical records to prevent disclosure of information that is not relevant to the litigation, the discovery order departed from the essential requirements of the law."). The decision below erred in holding otherwise to the extent unnecessary information would be open and subject to the ex parte exploration proceedings authorized in the 2013 amendments.

Having determined that Weaver is a proper party to assert the constitutional right to privacy in attempting to shield the disclosure of irrelevant, unnecessary, and protected medical information, and that she did not waive the protection with regard to medical information not relevant to the medical negligence action, we now address the question of whether the right to privacy has been violated. Due to the fundamental and highly guarded nature of this right, "any law that implicates the fundamental right of privacy, regardless of the activity, is subject to strict scrutiny and, therefore, presumptively unconstitutional." Gainesville Woman

Care, LLC v. State, 210 So. 3d 1243, 1245 (Fla. 2017); Winfield, 477 So. 2d at 547. Thus, the burden of proof rests with the State to justify an intrusion on privacy. Winfield, 477 So. 2d at 547.[4]

In an attempt to sustain the burden under the strict scrutiny test, Dr. Myers and the amici assert that the legislative intent behind the amendments is sufficient: to encourage settlement by providing equal access to relevant information, resulting in the inexpensive and expeditious administration of justice; screening out frivolous claims; and streamlining medical malpractice litigation. However, none of these asserted interests, individually or collectively, are sufficiently compelling to outweigh the interest of a patient in keeping private medical information that was given in confidence to medical personnel under the protections of both federal and Florida law when that information is not relevant to the prospective claim of malpractice.

---

4. Dr. Myers contends that he is not a government actor, and therefore, the right to privacy challenge fails. However, this Court has previously considered challenges to statutes on the basis that they violate the right to privacy where both parties to the action are private individuals, but one party benefits from operation of the statute. See, e.g., D.M.T. v. T.M.H., 129 So. 3d 320, 330 (Fla. 2013) (donor filed petition to establish parental rights and sought declaration of constitutional invalidity of assisted reproductive technology statute); Von Eiff v. Azicri, 720 So. 2d 510, 511-12 (Fla. 1998) (parents challenged statute which provided grandparents with a freestanding cause of action for visitation rights with minor grandchildren); Beagle v. Beagle, 678 So. 2d 1271, 1273 (Fla. 1996) (parents contested grandparents' petition for visitation rights with grandchild that was authorized pursuant to statute).

Moreover, even if those concerns were compelling, rather than address them with a steady hand and surgical precision such that the least intrusive means could be implemented, the amended statutes here have gashed Florida's constitutional right to privacy. Requiring claimants to authorize clandestine, ex parte secret interviews is far from the least intrusive means to accomplish those stated goals.[5]

The ex parte secret interview provisions of sections 766.106 and 766.1065 fail to protect Florida citizens from even accidental disclosures of confidential medical information that falls outside the scope of the claim because there would be no one present on the claimant's behalf to ensure that the potential defendant, his insurers, his attorneys, or his experts do not ask for disclosure of information from a former treating health care provider that is totally irrelevant to the claim. This concern with regard to ex parte secret interviews has been noted not only by this Court but also by multiple other courts. See Acosta v. Richter, 671 So. 2d 149,

_____

5. Further, although not at issue here, requiring potential claimants to list by name health care providers who do not have information potentially relevant to the claim, and provide dates of service, see § 766.1065(3)C., in and of itself reveals irrelevant private medical information. For example, if a claimant seeks to file an action based upon alleged malpractice by a podiatrist, the authorization requires him to report if he was seen by a health care provider who specializes in treating HIV, or sexual dysfunction, or depression, or substance abuse. This goes beyond the scope of the claim and intrudes upon a person's right to keep private medical information that has not been placed at issue by virtue of the action. However, again, this is not at issue here and must also be weighed against the limiting intent behind the requirement.

153 (Fla. 1996) ("Were unsupervised ex parte interviews allowed, medical malpractice plaintiffs could not object and act to protect against inadvertent disclosure of privileged information, nor could they effectively prove that improper disclosure actually took place."); see also Wenninger v. Muesing, 240 N.W.2d 333, 337 (Minn. 1976); Nelson v. Lewis, 534 A.2d 720, 723 (N.H. 1987); Crist v. Moffatt, 389 S.E.2d 41, 46 (N.C. 1990); Alsip v. Johnson City Med. Ctr., 197 S.W.3d 722, 727 (Tenn. 2006); Kirkland v. Middleton, 639 So. 2d 1002, 1004 (Fla. 5th DCA 1994); Horner v. Rowan Companies, Inc., 153 F.R.D. 597, 601 (S.D. Tex. 1994). While section 766.106 provides that a treating health care provider may have the right to refuse to be secretly interviewed ex parte, as noted by the Arizona Court of Appeals with regard to a similar statute, a provider may nonetheless feel pressured to participate or not fully understand his or her right to refuse:

> A physician may lack an understanding of the legal distinction between an informal method of discovery such as an ex parte interview, and formal methods of discovery such as depositions and [interrogatories], and may therefore feel compelled to participate in the ex parte interview. We also note that in Arizona, a substantial number of physicians are insured by a single "doctor owned" insurer. Realistically, this factor could have an impact on the physician's decision. In other words, the physician witness might feel compelled to participate in the ex parte interview because the insurer defending the medical malpractice defendant may also insure the physician witness.

Duquette v. Super. Ct., 778 P.2d 634, 641 (Ariz. Ct. App. 1989).

Furthermore, the supposed facilitation of settlement is not a reality for either party in medical malpractice litigation.  As the Illinois appellate court opined, a secret ex parte interview with a treating health care provider does not lead to the discovery of medical information that would not otherwise be discoverable, such that it facilitates settlement:

> It is not the ex parte conference in and of itself that leads to the early settlement of a case.  Rather, it is the information that is obtained during that ex parte conference that leads to a case's settlement.  That . . . information can be obtained . . . by obtaining a copy of the plaintiff's medical records or through a deposition of the plaintiff's treating physician.  These latter methods will provide defense counsel with the same information that they would obtain in an ex parte conference . . . without jeopardizing that physician's fiduciary obligation to his patient.

Petrillo v. Syntex Labs., Inc., 499 N.E.2d 952, 965-66 (Ill. App. Ct. 1986).

Under section 766.106(6)(b), the other informal discovery tools available are unsworn statements of the parties and treating health care providers (all with the claimant's counsel allowed to be present), written questions, production of documents and things, and physical and mental examinations.  There is nothing to indicate that these tools are deficient in the acquisition of information relevant to a potential medical malpractice claim, such that secret ex parte interviews justify the attendant risk of disclosure of irrelevant, constitutionally protected matters, medical information and otherwise, or serve a compelling interest.  See Winfield, 477 So. 2d at 547.  Therefore, the constitutional right to privacy has been violated

in this case.

The dissent is designed and constructed on a fundamentally flawed basis. The dissent further fosters confusion concerning this clear constitutional violation and is in conflict with the practical realities of today's litigation practice. With regard to medicine in the modern world of strained resources, the reality is that almost every malpractice litigant will be subject to the amendments' no-notice interview provision because it is exceedingly difficult, if not impossible, to schedule time with a doctor within fifteen days or seventy-two hours absent a critical, life-threatening situation. See § 766.106(6)(b)5., Fla. Stat. (2016). The difficulty will surely become more pronounced when a doctor is advised that a patient seeks not an appointment for care, but rather to schedule an interview regarding malpractice litigation against one of the doctor's colleagues. Yet, if the malpractice litigant at any point does not schedule an interview within such narrow time frames, the defense may then repeatedly approach the doctors without any notice and ex parte. See id. Thus, when viewed through the lens of real-life implications, the statute's facilitation of non-secret meetings is merely illusory.

Sprinkled throughout the dissent is reference to the term "relevant" based on the deeply flawed premise that opposing counsel in litigation should be the sole and exclusive arbiter in a secret ex parte, non-recorded meeting of that which is "relevant" with regard to the precious Florida constitutional right of privacy. With

this fatal flaw the dissent rings hollow. The dissent's undue reference to the amendment's use of the word "relevant" renders strict scrutiny no different than rational basis scrutiny. History has demonstrated that bar grievance procedures are totally insufficient to protect our fundamental rights of privacy during secret meetings. On the contrary, even the conduct of lawyers in public proceedings is very often beyond proper limitations. Additionally, there is nothing to limit the actions of other investigators and insurance adjusters.

Although the standard to be applied is whether there is a less invasive manner, a contrary interpretation advances the <u>most invasive</u> clandestine secret interrogations as a method to deal with the fundamental constitutional right of our citizens. The dissent even relies on cases that support our holding and conclusions, when those cases are properly and <u>fully</u> analyzed.

In <u>Coralluzzo v. Fass</u>, 450 So. 2d 858 (Fla. 1984), <u>superseded by statute</u>, § 456.057, Fla. Stat. (2009); <u>Hasan v. Garvar</u>, 108 So. 3d 570 (Fla. 2012); and <u>Acosta</u>, 671 So. 2d 149, this Court was not presented with a constitutional privacy challenge. Thus, these cases do not support the dissent's reliance upon them for the proposition that litigants had no protections prior to the legislative enactment of an evidentiary privilege. Indeed, because no constitutional privacy challenge was raised in any of those cases, this Court prudently did not make a single reference to the <u>constitutional</u> right to privacy. As a result, the statement in <u>Coralluzzo</u> that

"[n]o law, statutory or common, prohibits—even by implication—[the unilateral, ex parte interviews]," 450 So. 2d at 859, is wholly inapposite "because of the dominant force of the Constitution, an authority superior to both the Legislature and the Judiciary." Holley v. Adams, 238 So. 2d 401, 405 (Fla. 1970). Therefore, the fact that the litigants in those cases did not raise a constitutional challenge does not render true the contrary view's very disturbing conclusion that "there was nothing to prevent the ex parte interview with the nonparty treating physician in the absence of legislative protections." Dissenting op. at 60-61. This ill-founded conclusion confuses the concept of evidentiary privileges with fundamental Florida constitutional rights. The entire contrary argument falls when the confusion is analyzed and recognized.

In an attempt to distract from this misdirection, the contrary view hinges on a clause in our decision in Acosta that "there was no legal impediment to ex parte conversations between a patient's treating doctors and the defendants or their representatives." Dissenting op. at 61 (quoting Acosta, 671 So. 2d at 150). Conveniently, however, the dissent does not fully present the explanatory clause introducing that statement: "The present controversy has its genesis in Coralluzzo . . ., where, in a medical malpractice action, this Court held there was no common law or statutory privilege of confidentiality as to physician-patient communications in Florida and, hence, there was no legal impediment . . . ." Acosta, 671 So. 2d at

- 35 -

150 (emphasis added). Thus, when considered fully the critical fact is exposed and explained that Acosta and Coralluzzo simply did not involve a constitutional challenge whatsoever and did not have occasion to discuss any constitutional "impediments." It bears repeating to combat any obfuscation or confusion that just because the litigants did not raise the constitutional issue in prior cases does not mean the right was non-existent. Likewise, to perpetrate that misconception, a failure of complete analysis violates the tenet of constitutional avoidance this Court generally follows. Moreover, Coralluzzo was reviewed as a certified question of great public importance from a decision to deny a petition for writ of certiorari reviewing the denial of a protective order, and thus, all the courts involved in Coralluzzo were looking through an especially narrow lens focused on finding clearly established law, not the creation of new rights, especially none that the parties failed to raise. See Nader v. Fla. Dep't of Highway Safety & Motor Vehicles, 87 So. 3d 712, 723 (Fla. 2012) ("[C]ertiorari jurisdiction cannot be used to create new law where the decision below recognizes the correct general law and applies the correct law to a new set of facts to which it has not been previously applied. In such a situation, the law at issue is not a clearly established principle of law."); Coralluzzo, 450 So. 2d at 858-59. Relatedly, the incident in Coralluzzo did not take place until 1981, just one year after the constitutional privacy right was adopted by the voters, and thus, without having raised the issue, it is no surprise

- 36 -

the constitutional limitation had not been considered with regard to ex parte conferences with medical providers.

By contrast, the contrary view suggested does not accommodate that in this case the constitutional right has been raised and fully briefed at all levels for de novo review. Unlike Acosta and Hasan, where the evidentiary privilege statutes at issue were built upon only the spirit of the constitutional protections, thereby negating the need for a constitutional analysis, the amendments at issue today accomplish the opposite, affirmatively trampling on the constitutional privacy right and rendering it necessary, for the first time, to address the express constitutional issue.

Moreover, selective references to Hasan and Acosta ignore the only analogous and relevant portions of those opinions, which actually support our holding today. Specifically, although both cases concerned statutory limitations on ex parte discovery, unlike the supreme constitutional right at issue here today, the statutory rights at issue in those cases involved analyses into the potential for revelation of protected information. Equally applicable here under the least intrusive means standard, the statutory analyses in Hasan and Acosta led this Court to "reject the contention that ex parte conferences with treating physicians may be approved so long as the physicians are not required to say anything. We believe it is pure sophistry to suggest that the purpose and spirit of the statute would not be

violated by such conferences." Hasan, 108 So. 3d at 578 (quoting Acosta, 671 So. 2d at 156) (emphasis added).  The fact that today we analyze the constitutional right to privacy, as opposed to a limited statutory evidentiary privilege, does not change our conclusion in Hasan that "efforts to foster an environment conducive to inadvertent disclosures of privileged information . . . are impermissible."  Id.  In referencing the language "purpose and spirit of the statute," rather than the overall logic concerning overbreadth and illusory protections that applies equally under any good-faith strict scrutiny analysis, the contrary view expressed today simply changes the subject for discussion, rather than addressing the actual substance of the issues.

Likewise, the lone decision relied upon by the dissent that even touches upon the constitutional right to privacy and its application to ex parte medical interviews, a district court decision, S & A Plumbing v. Kimes, 756 So. 2d 1037, 1042 (Fla. 1st DCA 2000), does not control in any manner and is wholly inapposite when analyzed in context.  Kimes involved ex parte interviews in the workers' compensation context, which is wholly distinguishable from a medical malpractice action in that, as the Kimes court recognized, "The workers' compensation system is clearly intended to be self-executing, with the resort to adversarial proceedings being undertaken only as a last recourse to resolve intractable disputes between petitioners and employers and their insurance carriers."  Id. at 1041 (emphasis

added). Further, unlike workers' compensation claims, medical malpractice and wrongful death actions are completely adversarial and traditional actions at law resolved in the judicial branch by Article V courts.[6] Therefore, despite any attempt to compare workers' compensation to traditional litigation, this Court's long saga of ensuring the scheme's compliance with the right to access to courts undresses that disguised misconception.

Accordingly, as the Kimes court accurately understood the substantial differences between workers' compensation and traditional litigation, the fact that "[t]he workers' compensation system transposed dispute resolution for workplace injuries from the private law of torts to a publicly administered and regulated system" was central to its conclusion that no legitimate expectation of privacy exists in the extremely limited workers' compensation context with regard to

---

6. Further supporting our holding today, the Kimes court even noted that the moment a workers' compensation claim becomes sufficiently adversarial by appointment of an expert medical advisor, ex parte conferences are no longer permissible. See Kimes, 756 So. 2d at 1041 (citing Pierre v. Handi Van, Inc., 717 So. 2d 1115, 1117 (Fla. 1st DCA 1998)). Pierre even noted the impropriety that would flow from ex parte discussions once a matter becomes adversarial:

> Once disputes have arisen and ripened, however, requiring the assistance of [expert medical advisors], the case has become indisputably adversarial so that ex parte discussions with such experts are not appropriate . . . and the experts so chosen should not be subject to even the "appearance of impropriety," which would result from private meetings with either party.

717 So. 2d at 1117.

interviews with physicians specifically hired for compliance with workers' compensation.  Id. at 1042 (emphasis added).  The Kimes court further recognized the wholly different context of workers' compensation when it concluded that "to accept Kimes' absolute privacy argument would make it impossible to petition for, controvert and decide claims under the workers' compensation law without resort to a system of litigation . . . ."  Id. (emphasis added).  Yet, relying on the supposed purpose of the statute at issue here, the contrary view expressed today does not even acknowledge these differences.  However, as already discussed, the purpose of the statute at issue here in potentially encouraging settlement and avoiding litigation is not only proven to be fleeting, but also has little bearing on our analysis because it is simply not the least intrusive means.

Another very critical distinction arising from the workers' compensation context of the Kimes decision is that the only medical professional to be interviewed was explicitly hired for purposes of workers' compensation to evaluate the causal connection between the work performed and the injury.  Id.  ("The very foundation of an employee's right to receive benefits under the self-executing system in Chapter 440 requires a healthcare provider to assess the injury, establish a causal connection to the workplace accident, and communicate that information to the employer's insurance carrier.").  Yet, the contrary view does not include this aspect of the relationship and relies only on the fact that the physicians are treating

physicians. While the dissent antagonizes the relevant focus here as a "misreading," it ignores the fact that the constitutional analysis in <u>Kimes</u> focuses and relies specifically on the fact that the treating physicians were required to be hired under the narrow workers' compensation framework. <u>See id.</u> at 1042 ("By presenting himself to be examined by a health care provider for the purpose <u>not only for treatment for an injury, but also for evaluation of the injury and assessment of whether it is attributable to his employment</u>, Kimes consented to the provider disclosing to the carrier medical information relating to the claim.") (emphasis added). There is simply no comparison with the physicians hired specifically in the workers' compensation litigation in the <u>Kimes</u> context and the physicians hired by Weaver in the ordinary context of seeking medical care without an eye to litigation. Ex parte interviews with a singular physician in a workers' compensation claim with regard to a specific employment injury are wholly different than conducting ex parte secret meetings with all of the medical professionals a person has visited completely of his or her own volition in the course of regular medical care during the last two years before the medical malpractice action accrued.

In light of these distinctions, and the <u>Kimes</u> court's finding of no expectation of privacy in the mandatory workers' compensation medical visit, the <u>Kimes</u> court did not even have occasion to consider the least intrusive means aspect of our

constitutional privacy test. In any event, relative to the broad net cast in this scenario, any potential waiver conclusion arising from <u>Kimes</u> is also severely limited by the fact that there was no threat of irrelevant information being disclosed in <u>Kimes</u>.

Thus, <u>Kimes</u>, which concerned the administration of workers' compensation claims, has absolutely no bearing on this wrongful death action, which is adversarial and subjects litigants to the full powers conferred on Article V courts. Although the misdirection created by the contrary view must be addressed to ensure there is no unnecessary confusion, in the end the attempt to apply workers' compensation principles in this context is unavailing. Tellingly, not even Dr. Myers raised <u>Kimes</u> at any stage in this litigation.

Returning to the salient issue, in light of the adversarial nature and full discovery process applicable to medical malpractice and wrongful death actions, the dissent has provided no reason to overcome the fact that the standard discovery procedures with notice and participation of all parties that are employed daily without issue in thousands of cases are more than adequate to secure access to relevant information without trampling on the constitutional privacy rights of a Florida citizen plaintiff. The dissent misses the point when it suggests that a defendant would not even be interested in obtaining irrelevant medical information. Again, simply put, secret, ex parte non-recorded interviews

conducted by adverse litigants, investigators or insurance adjusters are not the least intrusive means for gathering otherwise discoverable information. Further, to compel a person's medical professionals to be placed in an environment conducive to even inadvertent disclosures of sensitive protected medical information violates the unambiguous constitutional "right to be let alone and free from governmental intrusion into the person's private life." Art. I, § 23, Fla. Const. Even the possibility that a person's extremely sensitive private medical information will be exposed is the type of governmental intrusion that the Florida Constitution protects against because it is impossible to know if an inadvertent disclosure occurred when the meetings are not only ex parte and without a judge, but also secret without a record. In the case of protected medical information, the danger is uniquely and unconstitutionally great because once the bell has been rung, it cannot be unrung. It defies credibility to compare the physicians in this case to ordinary fact witnesses. Physicians, unlike ordinary fact witnesses, are governed by strict confidentiality through not only HIPPA, but also the constitutional right to privacy discussed at length today.

Having determined that the statutory amendments impermissibly intruded on the fundamental and explicit constitutional right to privacy by the statutory requirements, the amendments cannot accomplish that end by conditioning the exercise of another highly guarded constitutional right on such submission in light

- 43 -

of the constitutional prohibition. This protection from government coercion has been recognized by the United States Supreme Court in what is known as the unconstitutional conditions doctrine. See Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586, 2595 (2013) ("[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."). However, such unconstitutional conditioning and coercion is exactly what the amendments to section 766.106 and 766.1065 have done here.

As Weaver contends, the amended statutes at issue here coerce and force victims of medical malpractice into foregoing their fundamental and explicit constitutional right to privacy to exercise their equally explicit and fundamental constitutional right to access to courts. The Florida Constitution provides that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." Art. I, § 21, Fla. Const. We have explained that "each of the personal liberties enumerated in the Declaration of Rights . . . is a fundamental right." State v. J.P., 907 So. 2d 1101, 1109 (Fla. 2004). "[C]ourts are generally opposed to any burden being placed on the rights of aggrieved persons to enter the courts because of the constitutional guarantee of access." Bystrom v. Diaz, 514 So. 2d 1072, 1075 (Fla. 1987) (quoting Carter v.

Sparkman, 335 So. 2d 802, 805 (Fla. 1976), receded from on other grounds,

Aldana v. Holub, 381 So. 2d 231 (Fla. 1980)).

The seminal case for government action and the right of access to courts is

Kluger v. White, 281 So. 2d 1 (Fla. 1973). In Kluger, this Court explained the

limitation on the power of the Legislature:

> [W]here a right of access to the courts for redress for a particular
> injury has been provided by statutory law predating the adoption of
> the Declaration of Rights of the Constitution of the State of Florida, or
> where such right has become a part of the common law of the State
> pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power
> to abolish such a right without providing a reasonable alternative to
> protect the rights of the people of the State to redress for injuries,
> unless the Legislature can show an overpowering public necessity for
> the abolishment of such right, and no alternative method of meeting
> such public necessity can be shown.

Id. at 4. At common law, Florida did not recognize a cause of action for wrongful

death; however, the Legislature authorized such an action prior to 1968. See Estate

of McCall v. United States, 134 So. 3d 894, 915 (Fla. 2014) (citing § 768.01, Fla.

Stat. (1941)) (plurality opinion). Therefore, the access to courts provision of the

Florida Constitution is applicable to wrongful death actions.

Although Kluger spoke in terms of total abolishment of a right, the scope of

the protection extends to protect situations in which legislative action significantly

obstructs the right of access:

> [I]n order to find that a right has been violated it is not necessary for
> the statute to produce a procedural hurdle which is absolutely
> impossible to surmount, only one which is significantly difficult. This

> is so because the Florida Constitution provides that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." Art. I, § 21, Fla. Const. This "openness" and necessity that access be provided "without delay" clearly indicate that a violation occurs if the statute obstructs or infringes that right to any significant degree.

Mitchell, 786 So. 2d at 527. The First District subsequently interpreted the word "significant" in the context of an access to courts challenge to mean "important" and "of consequence." Henderson, 883 So. 2d at 854.

The facts demonstrate that the statutes challenged here would require Weaver to forfeit the constitutional right to privacy and expose her late husband's medical and other information (and potentially hers)[7] up to two years prior to the alleged act of medical negligence, regardless of its relevance to her claim to prying lawyers, insurance companies, experts, and doctors to probe, as a condition to filing a wrongful death action. Moreover, the mandatory authorization and secret, ex parte interview provisions empower these individuals and entities to actively engage nonparties in unsupervised interviews without the presence of the claimant, the claimant's representative, or the claimant's attorneys, potentially leaving exposure of irrelevant and constitutionally protected private information otherwise

---

7. Weaver also raised a challenge based on her own right to privacy on the theory that her husband potentially revealed information about her and her medical history during the course of his medical care. In light of our holding today, however, we need not address this claim.

undiscoverable and nearly impossible to address.  Cf. Rasmussen, 500 So. 2d at 537 ("However, the subpoena in question gives petitioner access to the names and addresses of the blood donors with no restrictions on their use.  There is nothing to prohibit petitioner from conducting an investigation without the knowledge of the persons in question.  We cannot ignore, therefore, the consequences of disclosure to nonparties, including the possibility that a donor's coworkers, friends, employers, and others may be queried as to the donor's sexual preferences, drug use, or general life-style.").  The vulnerable state in which a medical malpractice

claimant is placed is a sufficiently important and significant impediment to seeking relief from a Florida court.[8]  This our Constitution simply does not allow.[9]

Having determined that the 2013 amendments to sections 766.106 and 766.1065 of the Florida Statutes are unconstitutional, we now must undertake consideration as to whether to sever the unconstitutional portions.  See Ray v. Mortham, 742 So. 2d 1276, 1280 (Fla. 1999) ("Severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." (citing State v. Calhoun Cty., 170 So. 883, 886 (Fla. 1936))).  Although

---

8.  Dr. Myers contends that the impediment at issue is merely the procedural act of filling out and executing the authorization, which in turn is not a significant infringement.  Indeed, we have previously upheld conditions precedent to filing a legal action so long as the condition is not "significantly difficult" to surmount.  For example, in Warren v. State Farm Mutual Automobile Insurance Co., 899 So. 2d 1090, 1092 (Fla. 2005), the challenged statute required providers of non-emergency medical services and medical services not provided in a hospital to submit a statement of charges to insurers within thirty days of service or be subject to automatic claim denial.  This Court held that the statute did not violate access to courts because it did not abolish the rights of medical providers to file claims for certain insurance benefits and was a reasonable condition precedent to filing such claims.  Id. at 1097.
However, viewing the amendments merely in terms of filling out an authorization is a superficial way to perceive and ignore their effect.  As we have made clear, this is not about paperwork, but privacy.

9.  In light of our holding today, we need not reach Weaver's other contentions that the 2013 amendments violated separation of powers and the prohibition against special laws under the Florida Constitution.

the 2013 act that amended the statutes did not include a severance clause, this presents no barrier. See Fla. Hosp. Waterman, Inc. v. Buster, 984 So. 2d 478 (Fla. 2008). In Waterman, we explained the questions that guide our severance analysis:

> (1) [W]hether the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (2) if the good and bad features are not inseparable and if the Legislature would have passed one without the other; and (3) whether an act complete in itself remains after the invalid provisions are stricken.

Id. at 493 (citing Moreau v. Lewis, 648 So. 2d 124, 128 (Fla. 1995)).

Noting the limited nature of our holding today and our severance principles, we make two strikes from the amended statutes. First, we strike in its entirety section 766.1065(3)E., Florida Statutes (2013), which contains the constitutionally infirm language: "This authorization expressly allows the persons or class of persons listed in subsections D.2.-4. above to interview the health care providers listed in subsections B.1.-2. above, without the presence of the Patient or the Patient's attorney." § 766.1065(3)E., Fla. Stat. Second, we strike the last sentence from section 766.106(6)(b)5., Florida Statutes (2013), which contains the constitutionally infirm language: "If the claimant's attorney fails to schedule an interview, the prospective defendant or his or her legal representative may attempt to conduct an interview without further notice to the claimant or the claimant's legal representative." § 766.106(6)(b)5., Fla. Stat.

## CONCLUSION

In sum, we hold today that the right to privacy in the Florida Constitution attaches during the life of a citizen and is not retroactively destroyed by death. Here, the constitutional protection operates in the specific context of shielding irrelevant, protected medical history and other private information from the medical malpractice litigation process. Furthermore, in the wrongful death context, standing in the position of the decedent, the administrator of the decedent's estate has standing to assert the decedent's privacy rights. Finally, the Legislature unconstitutionally conditioned a plaintiff's right of access to courts for redress of injuries caused by medical malpractice, whether in the wrongful death or personal injury context, on the claimant's waiver of the constitutional right to privacy. Therefore, we strike certain unconstitutional language from the 2013 amendments to sections 766.106 and 766.1065 of the Florida Statutes which authorized secret, ex parte interviews. We quash the decision below and remand for further proceedings consistent with this opinion.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
CANADY, J., dissents with an opinion, in which POLSTON and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, J., dissenting.

I disagree with the majority's conclusion that the challenged statutory provisions violate the right to privacy and the right of access to courts protected by the Florida Constitution. I would also reject Weaver's argument that the statutory provisions unconstitutionally encroach on this Court's rulemaking authority and constitute a prohibited special law. The First District correctly concluded that the statutory provisions withstood the constitutional challenges made by Weaver. I therefore dissent from the majority's unwarranted interference with the Legislature's authority.

## I.  RIGHT TO PRIVACY

### A.  Background and Waiver

In its decision below, the district court spent only a brief portion of its analysis addressing the issue of privacy, and rightfully so. See Weaver v. Myers, 170 So. 3d 873, 883 (Fla. 1st DCA 2015). Medical malpractice claimants have no reasonable expectation of privacy in medical information that is relevant to the alleged malpractice—and that is the only information authorized to be discussed under the ex parte amendments. See § 766.1065(1), Fla. Stat. (2013) (requiring presuit "authorization for release of protected health information . . . that is potentially relevant to the claim of personal injury or wrongful death"). Consequently, the Legislature did not overstep its bounds in 2013 by authorizing

ex parte interviews of nonparty treating physicians as part of the presuit, informal discovery process related to medical malpractice actions, given that the interviews are optional on the part of the treating physician and are limited by a relevance standard.[10]  Thus, I would affirm the district court's conclusion that the amendments do not violate the right to privacy.

Article I, section 23 of the Florida Constitution provides, in part, that "[e]very natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein."  Art. I, § 23, Fla. Const.  From this language, the majority concludes that a medical malpractice claimant has a constitutional right to prevent a nonparty treating physician from discussing ex parte the claimant's relevant medical information with certain interested parties.

The district court properly focused on the waiver of privacy protections that necessarily accompanies pursuit of medical malpractice claims.  Specifically, the district court concluded that "the decedent's medical condition is at issue" and any privacy rights were waived because "[i]t is well-established in Florida and across

_____

10. The Legislature first enacted a medical malpractice presuit notice and reasonable investigation requirement in 1985.  See ch. 85-175, §§ 12, 14, at 1196-97, 1199-1202, Laws of Fla.  In 1988, the Legislature amended the presuit process by imposing a mandatory "presuit investigation" requirement and outlining the permissible "informal discovery" to be used by the parties.  See ch. 88-1, §§ 48-53, at 164-68, Laws of Fla.; ch. 88-277, § 48, at 1494-95, Laws of Fla.

the country that any privacy rights that might attach to a claimant's medical information are waived once that information is placed at issue by filing a medical malpractice claim." Weaver, 170 So. 3d at 883. In doing so, the district court noted that the 2013 amendments do not apply to information that is not potentially relevant to the claim. Id. at 883 n.3 (citing § 766.1065(3)C., Fla. Stat.).

Consistent with the district court's analysis, the majority here recognizes that privacy matters must be analyzed differently in the context of litigation: "We have further recognized that '[t]he potential for invasion of privacy is inherent in the litigation process.' " Majority op. at 13 (alteration in original) (quoting Rasmussen v. S. Fla. Blood Serv., Inc., 500 So. 2d 533, 535 (Fla. 1987)). And more specifically, the majority recognizes the concept of privacy waiver in medical malpractice actions, noting that "a claimant may necessarily waive privacy rights to the medical information that is relevant to a claim by filing an action." Majority op. at 27.

Nevertheless, the majority ends up rejecting the ex parte meetings on constitutional privacy grounds based on the notion that the legislation requires the claimant to waive the right to privacy in "confidential health information that is not relevant to the claim." Majority op. at 27 (emphasis omitted). But nothing in the ex parte amendments authorizes the discussion of irrelevant medical information. Thus, the majority invalidates the ex parte amendments based on speculation and

- 53 -

various assumptions, including that members of the legal profession—who are subject to disciplinary review by this Court—will act outside the law, as well as that members of the medical community will misunderstand both their HIPAA[11] restrictions and the fact that these ex parte interviews are optional and limited by a relevance standard. I strongly disagree with the majority's decision to do so. Instead of invalidating these statutory provisions based on speculative assumptions that individuals will act outside the scope of the statutory authorization, I would approve the district court's analysis and affirm the district court's conclusion that the amendments do not violate the right to privacy.[12]

## B. Workers' Compensation Cases

The majority's decision is difficult to reconcile with the fact that ex parte

---

11. Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

12. The majority also offers no explanation for why a defendant would even be interested in obtaining protected information "that is totally irrelevant to the claim." Majority op. at 30. Any such information would be inadmissible at trial and the discussion of such information would subject the interviewer and interviewee to potential liability and discipline. The majority instead references "the practical realities of today's litigation practice." Majority op. at 33. But the majority then fails to identify a single "practical" use that would be served either by a defendant's attempt to obtain "totally irrelevant" protected information or by a medical professional's willingness to discuss such information. Instead, the referenced "practical realities" appear to relate to the majority's belief that attorneys "very often" act inappropriately. Majority op. at 34. Such a belief, of course, should not guide the majority's constitutional analysis.

interviews with nonparty treating physicians have long been authorized by Florida statute in the workers' compensation arena.  See § 440.13(4)(c), Fla. Stat. (2017).  As with the amendments at issue in this case, the workers' compensation ex parte interviews are limited by a relevance standard.  Id.  The First District long ago rejected a constitutional privacy challenge to the ex parte provisions of the workers' compensation statute.  See S & A Plumbing v. Kimes, 756 So. 2d 1037, 1042 (Fla. 1st DCA 2000).  There is no evidence to suggest that nonparty treating health care providers in the workers' compensation arena have had difficulty limiting their ex parte interviews to relevant medical information—and such ex parte interviews have been taking place for decades.  And yet the majority here assumes the opposite result in the medical malpractice context and then bases its constitutional analysis on that speculative assumption.  In doing so, the majority seeks to distinguish Kimes and workers' compensation cases, but the majority's reasoning is difficult to reconcile with its holding in this case.

For example, the majority observes that "[t]he workers' compensation system is clearly intended to be self-executing, with the resort to adversarial proceedings being undertaken only as a last recourse to resolve intractable disputes."  Majority op. at 38 (quoting Kimes, 756 So. 2d at 1041).  The majority later reiterates that the workers' compensation system is designed to resolve claims "without resort to a system of litigation."  Majority op. at 40 (quoting Kimes, 756

- 55 -

So. 2d at 1042). And the majority distinguishes "medical malpractice and wrongful death actions" on the basis that those actions "are completely adversarial and traditional actions at law resolved in the judicial branch by Article V courts." Majority op. at 39. But the majority's argument is flawed in at least two respects. First, implicit in the majority's argument is the premise that workers' compensation cases only become "adversarial" once a dispute becomes "intractable." Majority op. at 38. Such a premise overlooks "the practical realities," majority op. at 33, of workplace injury cases and the nature of the competing interests involved in those cases. Indeed, such a premise cannot be reconciled with the facts of Kimes itself, in which the disputed ex parte meeting took place after Kimes' request for authorization for ankle surgery had been denied and after Kimes had filed his claim. See Kimes, 756 So. 2d at 1038-39, 1041. Second, the majority's argument overlooks that the ex parte amendments at issue involve a medical malpractice presuit process which this Court has described as being "intended to promote the settlement of meritorious claims at an early stage without the necessity of a full adversarial proceeding." Williams v. Campagnulo, 588 So. 2d 982, 983 (Fla. 1991) (emphasis added). Thus, ex parte interviews with nonparty treating physicians are designed to accomplish the same underlying purpose in both instances—that is, to avoid adversarial proceedings.

The majority further attempts to distinguish <u>Kimes</u> by concluding "that the only medical professional to be interviewed was explicitly hired for purposes of workers' compensation to evaluate the causal connection between the work performed and the injury." Majority op. at 40. The majority's conclusion is problematic in at least three respects. First, in reaching its conclusion, the majority misreads <u>Kimes</u> and oversimplifies the workers' compensation process. As is clear from <u>Kimes</u>, the disputed ex parte interview took place "between Kimes' <u>treating physician</u> and representatives of the employer/carrier's attorney." <u>Kimes</u>, 756 So. 2d at 1038 (emphasis added). The fact that the employer/carrier in workers' compensation cases generally selects the treating physician does not alter the fact that the medical professional at issue was Kimes' treating physician. A physician who treats an alleged workplace injury is no less of a "treating physician" than a physician who treats an alleged medical malpractice injury. Second, it appears the majority's conclusion is based on the assumption that the medical professional in <u>Kimes</u> was somehow not in possession of irrelevant protected information. But naturally, any treating physician will obtain information from the patient regarding the patient's medical history and conditions, as well as other information—that is, protected information that may or may not be relevant to establishing a "causal connection between the work performed and the injury." Majority op. at 40. That, of course, explains why the Legislature limited the workers' compensation ex parte

meetings by a relevance standard—just as the Legislature did with the 2013 amendments at issue. Third, as to the majority's suggestion that the ex parte meeting in <u>Kimes</u> was harmless because it was designed to assist in establishing a "causal connection" to the injury, majority op. at 40, the majority overlooks that the purpose of the medical malpractice presuit process is very much the same— that is, to help defendants and their insurers determine causation and resolve claims. <u>See</u> <u>Cohen v. Dauphinee</u>, 739 So. 2d 68, 71 (Fla. 1999) ("[T]he prevailing policy of this state relative to medical malpractice actions is to encourage the early settlement of meritorious claims and to screen out frivolous claims.").

The majority also observes that "the <u>Kimes</u> court even noted that the moment a workers' compensation claim becomes sufficiently adversarial by appointment of an expert medical advisor, ex parte conferences are no longer permissible." Majority op. at 39 n.6 (citing <u>Kimes</u>, 756 So. 2d at 1041 (citing <u>Pierre v. Handi Van, Inc.</u>, 717 So. 2d 1115, 1117 (Fla. 1st DCA 1998))). But <u>Pierre</u> clearly noted that once an expert medical advisor is appointed, "<u>ex parte</u> discussions <u>with such experts</u> are not appropriate." <u>Pierre</u>, 717 So. 2d at 1117 (emphasis added). And <u>Pierre</u> went on to note that such meetings were prohibited by "either party." <u>Id.</u> Nothing about this conclusion by <u>Pierre</u> supports the majority's decision here. Again, the amendments at issue contemplate ex parte

interviews with nonparty treating physicians—the same fact witnesses to whom the plaintiff already has ex parte access.[13]

Finally, after analyzing <u>Kimes</u>, the majority concludes "that there was <u>no threat of irrelevant information</u> being disclosed in <u>Kimes</u>." Majority op. at 42 (emphasis added). The majority reaches this conclusion despite the fact that the parties' interests in <u>Kimes</u> were clearly adverse to one another, despite the fact that treating physicians in workers' compensation cases are generally selected not by the injured employee but rather by the employer/carrier, and despite the fact that the treating physician in <u>Kimes</u>—just like any other treating physician— undoubtedly possessed irrelevant protected medical information. The majority's reading of <u>Kimes</u> cannot be reconciled with the majority's conclusion and reasoning in the instant case.

In the end, the majority's attempts to distinguish <u>Kimes</u> and workers' compensation cases are logically flawed. And the majority cannot explain why treating physicians—for decades—have had little difficulty adhering to a relevance standard in workers' compensation ex parte interviews and why those same medical professionals are unable to do so in medical malpractice ex parte

---

13. In <u>Kimes</u>, an expert medical advisor had not even been appointed at the time of the ex parte conference with the treating physician. <u>See</u> <u>Kimes</u>, 756 So. 2d at 1041. And yet it can hardly be argued that the dispute in <u>Kimes</u> was not "adversarial."

interviews.

## C. This Court's Ex-Parte-Interview Jurisprudence

The majority's decision is also difficult to reconcile with the fact that this Court has repeatedly addressed the issue of ex parte interviews of nonparty treating physicians in medical malpractice cases and recognized that the underlying confidentiality rights were created by the Legislature. Although the referenced cases did not address constitutional challenges to ex parte meetings and are therefore not controlling here, the case law helps to illustrate the overreach by the majority. Despite the majority's claim to the contrary, a "proper[] and full[] analy[sis]" of these cases does not support the majority's holding and conclusions. Majority op. at 34 (emphasis omitted).

In 1984, this Court squarely rejected a medical malpractice plaintiff's attempt to prohibit an ex parte meeting between the defendant health care provider and the plaintiff's treating physician. See Coralluzzo v. Fass, 450 So. 2d 858, 859 (Fla. 1984). In doing so, Coralluzzo recognized that there was no such thing as physician/patient confidentiality under Florida law at that time. Id. at 859. And Coralluzzo expressly concluded that there was "no reason in law or in equity to" find for the plaintiff and that "[n]o law, statutory or common, prohibits—even by implication—respondents' actions." Id. (emphasis added). In other words, there was nothing to prevent the ex parte interview with the nonparty treating physician

- 60 -

in the absence of legislative protections.

The majority describes this dissent's depiction of Coralluzzo as "disturbing" and believes that the absence of a constitutional challenge in Coralluzzo renders this dissent's summary of Coralluzzo "ill-founded." Majority op. at 35. But the majority misses the point. As an initial matter, the reason there was no constitutional challenge in Coralluzzo is because there was no State action involved—there was no statute to even be challenged. Thus, Coralluzzo concluded that the ex parte meetings were permitted because the Legislature had not acted to prohibit them. In other words, the ex parte meetings could only be prevented by State action. Moreover, as explained below, the majority overlooks that this dissent's depiction of Coralluzzo is entirely consistent with how this Court itself has unanimously described Coralluzzo. See Acosta v. Richter, 671 So. 2d 149, 150 (Fla. 1996) (noting that Coralluzzo held that "there was no legal impediment to [the] ex parte conversations" (emphasis added)).

In 1988, the Legislature responded to Coralluzzo by creating a broad physician/patient confidentiality privilege—a privilege that previously did not exist under Florida law. See ch. 88-208, § 2, at 1194-96, Laws of Fla. That new statutory privilege also carried with it, among other things, a limited exception for medical malpractice actions. Id.

Subsequent to the Legislature's 1988 statutory amendments, this Court has

twice revisited the issue of ex parte meetings with nonparty treating physicians in medical malpractice cases, both times striking down the ex parte meetings on the specific grounds that they were precluded by the 1988 statutory amendments. See Hasan v. Garvar, 108 So. 3d 570, 578 (Fla. 2012); Acosta, 671 So. 2d at 156. As with Coralluzzo, neither Hasan nor Acosta supports the conclusion that the Legislature acted unconstitutionally here.

In Acosta, this Court began by recognizing that the issue presented "ha[d] its genesis in Coralluzzo." Acosta, 671 So. 2d at 150. In assessing that previous decision, Acosta unanimously explained that Coralluzzo stood for the proposition that "there was no legal impediment to ex parte conversations between a patient's treating doctors and the defendants or their representatives." Id. (emphasis added). Thus, this Court in Acosta summarized Coralluzzo in the exact same manner that the majority here finds to be "disturbing." See majority op. at 35. Acosta then went on to examine the Legislature's 1988 statutory amendments and ultimately concluded that those amendments provided the previously missing "legal impediment," Acosta, 671 So. 2d at 150, to prevent medical malpractice defendants from conducting ex parte meetings with plaintiffs' treating physicians. Specifically, Acosta recognized that the Legislature had "create[d] a physician-patient privilege where none existed before" and had "provide[d] an explicit but limited scheme for the disclosure of personal medical information." Id. at 154.

- 62 -

Acosta went on to reject the proposed ex parte conferences because they did not fall within the statute's narrow "medical negligence" exception. Id. at 156.[14] In other words, Acosta recognized that the Legislature had broadly protected a patient's medical information and that the Legislature had created "a strict scheme for limited disclosure" which did not include a specific exception for the disclosure of protected information during ex parte conferences with treating physicians. Id. In reaching its holding, Acosta noted that "the legislature has considerable latitude in providing Florida citizens with a high degree of privacy in their medical information." Id.

Similarly, Hasan—which was decided in 2012, shortly before the 2013 statutory amendments at issue in this case—noted that the 1988 statutory amendments "broadened the statutory protections for physician-patient confidentiality." Hasan, 108 So. 3d at 573. And Hasan similarly rejected the ex parte meeting because it did not fall within the statute's "limited, defined exceptions." Id. at 578. Thus, Acosta and Hasan both recognized that the Legislature had closed the door on ex parte interviews through the 1988 statutory

_____

14. The majority suggests that Acosta adopted a quote from Kirkland v. Middleton, 639 So. 2d 1002, 1004 (Fla. 5th DCA 1994), which expressed a blanket concern about ex parte interviews and the complete lack of protection to Florida citizens from the disclosure of information "that is totally irrelevant to the claim." Majority op. at 30-31. But Acosta quoted Kirkland simply to explain how the district court reached its decision in Kirkland. Acosta, 671 So. 2d at 152-53.

amendments.

Despite the clear import of these cases, the majority concludes that the cases "actually support" the majority's decision in this case. Majority op. at 37. Moreover, the majority asserts that this dissent has "selective[ly] reference[d]" the cases and "ignore[d]" those portions which support the majority's decision. Majority op. at 37. On the contrary, these cases offer no support to the conclusion that the Legislature is powerless to reauthorize these ex parte meetings. For example, the majority points to certain language from Acosta, which was later reiterated in Hasan, in which this Court rejected the idea of permitting ex parte conferences with treating physicians "so long as the physicians are not required to say anything." Majority op. at 37 (quoting Hasan, 108 So. 3d at 578 (quoting Acosta, 671 So. 2d at 156)). The majority accurately notes that in rejecting that idea, Acosta concluded that "[w]e believe it is pure sophistry to suggest that the purpose and spirit of the statute would not be violated by such conferences." Majority op. at 37-38 (quoting Hasan, 108 So. 3d at 578 (quoting Acosta, 671 So. 2d at 156)). But this quote from Acosta does not support the majority's decision here. As is clear from the plain text of the quote, Acosta rejected such sham meetings because they would violate "the purpose and spirit of the statute." Acosta, 671 So. 2d at 156 (emphasis added). Again, it was the statute which protected the information, the statute which established the "strict scheme for

limited disclosure," id., and the statute which did not include an express exception for the disclosure of protected information during ex parte meetings with treating physicians. Thus, Acosta merely recognized the obvious—that it would have been "pure sophistry," id., to permit such sham meetings, given that the statute did not permit the discussion of any protected information at such meetings, not even relevant information. Here, the Legislature expressly amended the legislatively created "strict scheme for limited disclosure," id., so as to specifically allow for the discussion of relevant information at ex parte meetings. The quote from Acosta, when properly analyzed, does not support the majority's holding. The same is true when Acosta and the other referenced cases are properly analyzed in their entirety.

Lastly, in both its general analysis and its attempt to read the referenced case law to support its holding in this case, the majority repeatedly references "strict scrutiny," "less invasive manner," and "least intrusive means." Majority op. at 34, 37, 38. And the majority asserts that this dissent instead "advances the most invasive clandestine secret interrogations as a method to deal with the fundamental constitutional right of our citizens." Majority op. at 34. But the majority again misses the point. The issue here is straightforward: whether the Legislature is permitted to once again place medical malpractice defendants on equal footing with plaintiffs with respect to access to an important fact witness. There is no "less restrictive" way to put the defendant on equal footing other than to allow ex parte

access by the defendant—the plaintiff, of course, already has ex parte access to that fact witness. Thus, the basic question is whether the Legislature may, in fact, place the defendant on equal footing. This Court's case law, beginning with Coralluzzo, recognizes that prior to the Legislature's 1988 statutory amendments, medical malpractice defendants had equal ex parte access to nonparty treating physicians. Thus, it stands to reason that the Legislature should very well be able to restore the equal access that the Legislature itself took away, so long as it does so in a HIPAA-compliant manner. The majority instead concludes that the Legislature has no business doing so. I respectfully disagree with the majority's analysis and conclusion.[15]

### D. Conclusion

To sum up, the majority here holds it unconstitutional for the Legislature to now authorize optional ex parte meetings which are limited by a relevance standard—even though the Legislature is the same independent branch of government that closed the door on ex parte meetings in the first place and no

---

15. The majority also makes reference to "the standard discovery procedures with notice and participation of all parties that are employed daily without issue in thousands of cases." Majority op. at 42 (emphasis added). But the majority then fails to mention that in those "thousands of cases," plaintiffs and defendants alike are generally permitted to contact fact witnesses on an ex parte basis. Again, the only reason why post-1988 medical malpractice defendants have not had equal ex parte access to those fact witnesses who happen to be nonparty treating physicians is because the Legislature took away that equal access.

Florida case law has ever held that the constitutional right of privacy precludes the ex parte disclosure of information bearing on a malpractice claim. On the contrary, the Legislature was well within its bounds to carve out a limited, HIPAA-compliant exception to a legislatively created right in order to attempt to place plaintiffs and defendants on a level playing field with respect to access to certain important nonparty fact witnesses. See, e.g., Callahan v. Bledsoe, No. 16-2310-JAR-GLR, 2017 WL 590254, at *1 (D. Kan. Feb. 14, 2017) ("[T]his District has a well-established practice of allowing informal ex parte interviews of Plaintiff's treating physicians who are merely fact witnesses as long as a defendant complies with HIPAA and its related regulations."); Arons v. Jutkowitz, 880 N.E.2d 831, 842 (N.Y. 2007) (finding that "there was no basis for" the plaintiffs to decline to sign "HIPAA-compliant authorizations permitting their treating physicians to discuss the medical condition at issue in the litigation with defense counsel," given that the plaintiffs had "waived the physician-patient privilege as to this information when they brought suit").

In short, medical malpractice claimants waive whatever constitutional privacy rights they may have in relevant medical information. Because the 2013 amendments do not in any way authorize the discussion of irrelevant medical information, medical malpractice claimants have no constitutional right to prevent the ex parte meetings. I would therefore affirm the district court's conclusion that

the ex parte amendments do not violate the right to privacy. Consequently, I would not address the issue of whether a person's privacy rights survive death.

## II.  ACCESS TO COURTS

The district court properly rejected Weaver's argument that the 2013 ex parte amendments unconstitutionally burden the right to access the courts guaranteed by article I, section 21 of the Florida Constitution. In doing so, the district court examined this Court's decision in Kluger v. White, 281 So. 2d 1 (Fla. 1973), and concluded that the amendments did not "abolish[], eliminate[], or severely limit[] a substantive right to redress of a specific injury." Weaver, 170 So. 3d at 882 (emphasis omitted). The district court then examined this Court's decision in Warren v. State Farm Mutual Automobile Insurance Co., 899 So. 2d 1090 (Fla. 2005), and concluded that the amendments authorizing the ex parte interviews were "a reasonable condition precedent to filing suit." Weaver, 170 So. 3d at 882. The district court also observed that the predecessor statute to section 766.106—setting forth the original presuit notice and screening requirements—has previously been upheld against an access to courts challenge. Id. (citing Lindberg v. Hosp. Corp. of Am., 545 So. 2d 1384, 1386 (Fla. 4th DCA 1989), approved, 571 So. 2d 446 (Fla. 1990)).

The majority here instead holds that the amendments violate the right of access to courts under the unconstitutional conditions doctrine. See majority op. at

44.  Specifically, the majority finds that the amendments "require Weaver to forfeit the constitutional right to privacy and expose her late husband's medical and other information (and potentially hers) . . . regardless of its relevance to her claim to prying lawyers, insurance companies, experts, and doctors to probe, as a condition to filing a wrongful death action."  Majority op. at 46.  But the ex parte amendments require no such "forfeit[ure]."

As an initial matter, the majority itself recognizes that any constitutional privacy rights with respect to relevant information are waived by plaintiffs in medical malpractice actions.  See majority op. at 27.  In other words, the ex parte amendments do not establish a plaintiff's waiver of any constitutional privacy rights in relevant information—instead, that waiver is accomplished by the plaintiff's own action in pursuing a malpractice claim.  Thus, the majority's conclusion rests solely on the notion that the amendments "require" plaintiffs to waive their privacy rights in irrelevant information in order to obtain access to courts.  But as noted above, nothing in the 2013 amendments authorizes the discussion of irrelevant medical information.  Because the ex parte amendments do not "require" a waiver or forfeiture of any privacy rights that are not already waived by the plaintiff's own action in pursuing a malpractice claim, the amendments cannot be said to unconstitutionally condition a plaintiff's right of access to courts on the waiver of the right to privacy.

- 69 -

This Court has repeatedly recognized the legitimacy of the medical malpractice presuit process.  See, e.g., Cohen, 739 So. 2d at 71-72 ("[T]he prevailing policy of this state relative to medical malpractice actions is to encourage the early settlement of meritorious claims and to screen out frivolous claims. . . .  This policy is best served by the free and open exchange of information during the presuit screening process."); Kukral v. Mekras, 679 So. 2d 278, 284 (Fla. 1996) (recognizing "the legislative policy of requiring the parties to engage in meaningful presuit investigation, discovery and negotiations" and "screening out frivolous lawsuits and defenses"); Weinstock v. Groth, 629 So. 2d 835, 838 (Fla. 1993) ("[T]he purpose of the chapter 766 presuit requirements is to alleviate the high cost of medical negligence claims through early determination and prompt resolution of claims . . . ."); Williams, 588 So. 2d at 983 (noting the "legitimate legislative policy" of "promot[ing] the settlement of meritorious claims at an early stage without the necessity of a full adversarial proceeding").  The 2013 ex parte amendments simply add to that legitimate presuit process by "impos[ing] a reasonable condition precedent to filing a [medical malpractice] claim."  Warren, 899 So. 2d at 1097.  Accordingly, I would affirm the district court's conclusion that the amendments do not violate the right of access to courts.

### III.  SEPARATION OF POWERS

The district court rejected Weaver's argument that the 2013 amendments

unconstitutionally encroach on this Court's rulemaking authority under article V, section 2(a) of the Florida Constitution. Weaver, 170 So. 3d at 880. Specifically, Weaver alleged that the ex parte amendments constitute "a procedural change which impermissibly conflicts with the limitations on informal discovery methods as outlined by Florida Rule of Civil Procedure 1.650." Id. at 878. In rejecting Weaver's argument, the district court correctly concluded that the amendments do not conflict with rule 1.650 and "are integral to other substantive portions of the statute." Id. at 880.

Rule 1.650 specifically addresses section 766.106, Florida Statutes, and the medical malpractice presuit notice and screening process. Among other things, the rule sets forth the following three types of informal presuit discovery, along with the procedures for conducting same: unsworn statements by parties, production of documents or things, and physical examinations. Fla. R. Civ. P. 1.650(c)(1)-(2). As the district court aptly noted, rule 1.650 was adopted by this Court in 1988 shortly after the enactment of chapter 88-277, § 48, Laws of Florida, in which the Legislature amended the then-existing presuit statute to provide for those same three specific methods of informal presuit discovery.[16] Weaver, 170 So. 3d at 879-80 (citing ch. 88-277, § 48, at 1494, Laws of Fla.); see also In re Med. Malpractice

---

16. Rule 1.650 has not been updated to reflect other permissible methods of informal presuit discovery subsequently authorized by the Legislature, including the taking of unsworn statements from a claimant's treating health care providers

- 71 -

Presuit Screening Rules—Civil Rules of Procedure, 536 So. 2d 193, 193 (Fla. 1988). The ex parte amendments at issue do not conflict with rule 1.650. And in any event, that procedural rule does not operate to prevent the Legislature from making substantive changes to the medical malpractice presuit process, which is exactly what the Legislature did through the ex parte amendments. See Kuhajda v. Borden Dairy Co. of Ala., LLC., 202 So. 3d 391, 396 (Fla. 2016) ("A procedural rule should not be strictly construed to defeat a statute it is designed to implement."); Benyard v. Wainwright, 322 So. 2d 473, 475 (Fla. 1975) ("[T]he statute must prevail over our rule because the subject is substantive law.").

This Court has defined substantive law "as that part of the law which creates, defines, and regulates rights, or that part of the law which courts are established to administer." Haven Fed. Sav. & Loan Ass'n v. Kirian, 579 So. 2d 730, 732 (Fla. 1991). On the other hand, "[p]rocedural law concerns the means and method to apply and enforce those duties and rights." Benyard, 322 So. 2d at 475. This Court has recognized that situations arise in which statutes may contain both substantive and procedural aspects:

> Of course, statutes at times may not appear to fall exclusively into either a procedural or substantive classification. We have held that where a statute contains some procedural aspects, but those provisions are so intimately intertwined with the substantive rights

and the submission of written questions. See, e.g., ch. 2003-416, § 49, at 65-66, Laws of Fla.

created by the statute, that statute will not impermissibly intrude on the practice and procedure of the courts in a constitutional sense, causing a constitutional challenge to fail. See Caple v. Tuttle's Design-Build, Inc., 753 So. 2d 49, 54 (Fla. 2000); see also State v. Raymond, 906 So. 2d 1045, 1049 (Fla. 2005). If a statute is clearly substantive and "operates in an area of legitimate legislative concern," this Court will not hold that it constitutes an unconstitutional encroachment on the judicial branch. Caple, 753 So. 2d at 53 (quoting VanBibber v. Hartford Accident & Indem. Ins. Co., 439 So. 2d 880, 883 (Fla. 1983)).

Massey v. David, 979 So. 2d 931, 937 (Fla. 2008).

Here, the amendments are "clearly substantive and 'operate[] in an area of legitimate legislative concern.' " Id. (quoting Caple, 753 So. 2d at 53). And any procedural aspects are merely incidental. Id. As explained above, this Court has concluded that prior to the 1988 statutory amendments, defendants had the right to attempt to meet with plaintiffs' nonparty treating physicians on an ex parte basis. See Coralluzzo, 450 So. 2d at 859. And in the wake of the 1988 statutory amendments, this Court has twice recognized that the Legislature closed the door on those ex parte meetings by creating a broad physician/patient confidentiality privilege with only certain limited exceptions. See Hasan, 108 So. 3d at 576-77; Acosta, 671 So. 2d at 154. The ex parte amendments at issue thus "regulate," Kirian, 579 So. 2d at 732, legislatively created rights by once again allowing for ex parte meetings—but only under certain circumstances and conditions. And the amendments do so in a medical malpractice area that this Court has recognized involves "legitimate legislative policy." Williams, 588 So. 2d at 983.

- 73 -

As the district court recognized, this Court previously rejected the argument that the medical malpractice presuit notice requirement violates the separation of powers. Weaver, 170 So. 3d at 878-79 (citing Williams, 588 So. 2d at 983). Williams, which involved the original medical malpractice presuit notice and reasonable investigation statute enacted in 1985, examined the overall presuit process, noting that "[t]he statute . . . established a process intended to promote the settlement of meritorious claims at an early stage without the necessity of a full adversarial proceeding." Williams, 588 So. 2d at 983. And Williams concluded "that the statute is primarily substantive and that it has been procedurally implemented by our rule 1.650, Florida Rules of Civil Procedure." Id. Nothing in Williams supports the opposite conclusion here—that is, that the ex parte amendments are procedural.

I would affirm the district court's conclusion that the ex parte amendments do not unconstitutionally encroach on this Court's rulemaking authority.

## IV. SPECIAL LAW

The district court rejected Weaver's argument that the 2013 amendments constitute a prohibited special law in violation of article III, section 11 of the Florida Constitution. In doing so, the district court examined the two factors set forth by this Court in Biscayne Kennel Club, Inc. v. Florida State Racing Commission, 165 So. 2d 762, 763-64 (Fla. 1964), for determining whether a law

that operates through a classification system is a valid general law. Weaver, 170 So. 3d at 881. The district court concluded that the ex parte amendments met those two criteria and thus constituted a valid general law. Id. The district court also rejected Weaver's argument that this Court's plurality decision in Estate of McCall v. United States, 134 So. 3d 894 (Fla. 2014), compels the conclusion "that medical malpractice plaintiffs now may not be treated differently from other plaintiffs because no medical malpractice crisis exists." Weaver, 170 So. 3d at 881. I would affirm the district court's conclusion that the 2013 amendments are a valid general law.

Article III, section 11(a) of the Florida Constitution prohibits special laws or general laws of local application pertaining to certain subjects, including "rules of evidence in any court" and "conditions precedent to bringing any civil or criminal proceedings." Art. III, §§ 11(a)(3), (a)(7), Fla. Const.

This Court has explained that "a special law is one relating to, or designed to operate upon, particular persons or things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal." Dep't of Bus. Reg. v. Classic Mile, Inc., 541 So. 2d 1155, 1157 (Fla. 1989) (quoting State ex rel. Landis v. Harris, 163 So. 237, 240 (Fla. 1934)).

On the other hand, a law is general if "it operates uniformly upon subjects as

they may exist in the state, applies uniformly within permissible classifications, operates universally throughout the state or so long as it relates to a state function or instrumentality." Dep't of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So. 2d 879, 881 (Fla. 1983). "A general law operates uniformly, not because it operates upon every person in the state, but because every person brought under the law is affected by it in a uniform fashion." Id.

Here, the ex parte amendments involve a legislative classification—medical malpractice claimants and defendants. Thus, the following two factors determine whether that classification is valid: (1) whether the class is "open to others who may enter it"; and (2) whether there is "a rational distinction between those in the class and those outside it, when the purpose of the legislation and the subject of the regulation are considered." Biscayne Kennel Club, 165 So. 2d at 764.

The first Biscayne Kennel Club prong is undoubtedly met—the class here is not closed but rather is "open" to all future parties to medical malpractice actions. Thus, the only question is whether there is "a rational distinction between those in the class and those outside it, when the purpose of the legislation and the subject of the regulation are considered." Id. The district court correctly concluded that there is such a rational distinction. The ex parte amendments are consistent with decades of precedent finding that it is appropriate to treat medical malpractice claimants and defendants differently than other personal injury claimants and

defendants. Medical malpractice is an area that has been historically regulated by the Legislature with the goal of "ensuring the availability of adequate medical care." Weaver, 170 So. 3d at 881.

Weaver argues that the ex parte amendments impermissibly treat medical malpractice claimants differently and less favorably than all other personal injury claimants. Weaver also takes issue with the district court's dismissal of McCall. Specifically, Weaver argues that because the McCall plurality found that no medical malpractice insurance crisis currently exists, it was error for the district court below to justify the ex parte amendments by relying on "a decades-old finding" by the Legislature that a medical malpractice crisis existed at the time the presuit process was originally enacted. Weaver's arguments are not persuasive.

As an initial matter, McCall has no application to this case. McCall involved an equal protection challenge to statutory caps on noneconomic damages and had nothing to do with the issue of prohibited special laws. McCall, 134 So. 3d at 897. Moreover, any suggestion that a medical malpractice "crisis" must, in fact, exist as a prerequisite for permissible legislative classifications involving medical malpractice parties is unwarranted. A special law inquiry does not involve this Court acting as a super-legislative body to review the Legislature's policy decisions. Instead, as it relates to the second Biscayne Kennel Club prong, the appropriate inquiry is whether there is "a rational distinction between those in the

class and those outside it, when the purpose of the legislation and the subject of the regulation are considered." Biscayne Kennel Club, 165 So. 2d at 764 (emphasis added).

As to the "subject of the regulation," id., chapter 766, Florida Statutes, is entitled "Medical Malpractice and Related Matters." Because the subject being regulated is medical malpractice matters—and not all personal injury tort matters, including those unrelated to medical malpractice—it obviously makes sense that the ex parte amendments classify medical malpractice claimants and defendants differently than other personal injury claimants and defendants.

As to the "purpose of the legislation," Biscayne Kennel Club, 165 So. 2d at 764, the district court noted that the presuit notice and investigation statutes "were originally enacted by the Legislature to combat the financial crisis in the medical liability insurance industry by encouraging early settlement and negotiation of claims." Weaver, 170 So. 3d at 881 (citing Univ. of Miami v. Echarte, 618 So. 2d 189, 191-92 (Fla. 1993)). In the years since that original enactment, this Court has described the purpose of the presuit process in general terms. Namely, the purpose is to attempt to control "the high cost of medical negligence claims through early determination and prompt resolution of claims," Weinstock, 629 So. 2d at 838, and "promot[ing] the settlement of meritorious claims at an early stage without the necessity of a full adversarial proceeding," Williams, 588 So. 2d at 983. "Indeed,

the prevailing policy of this state relative to medical malpractice actions is to encourage the early settlement of meritorious claims." Cohen, 739 So. 2d at 71. And the best way to accomplish that "prevailing policy" is through "the free and open exchange of information during the presuit screening process," id. at 72, and by "requiring the parties to engage in meaningful presuit investigation, discovery and negotiations," Kukral, 679 So. 2d at 284. Providing both sides in a medical malpractice suit with the same pretrial access (potentially) to important nonparty fact witnesses is undoubtedly rationally related to the Legislature's interest in promoting early settlement and attempting to keep costs down in order to help make Florida an attractive place for doctors to practice. In other words, the legislative classification here between parties to medical malpractice claims and parties to other personal injury tort claims is rational when considering "the purpose of the legislation." Biscayne Kennel Club, 165 So. 2d at 764.

This Court recently explained the burden on a party challenging a legislative classification:

> This Court has held that the law must be upheld unless the Legislature could not have any reasonable ground for believing that there were public considerations justifying the particular classification and distinction made. North Ridge Gen. Hosp., Inc. v. City of Oakland Park, 374 So. 2d 461, 465 (Fla. 1979). Further, this Court has held that "one who assails the classification has the burden of showing that it is arbitrary and unreasonable." Id. at 465. The appellees have not met this burden.

License Acquisitions, LLC v. Debary Real Estate Holdings, LLC, 155 So. 3d 1137, 1149 (Fla. 2014). The issue here is not whether a medical malpractice "crisis" exists, but rather whether Weaver has shown that "the Legislature could not have had <u>any reasonable ground for believing</u> that there were public considerations justifying the particular classification and distinction made." <u>North Ridge Gen. Hosp.</u>, 374 So. 2d at 465 (emphasis added). And Weaver does not come close to meeting this burden.

## V. CONCLUSION

For the reasons explained above, I would affirm the First District's decision in <u>Weaver</u>. The ex parte amendments do not violate the right to privacy or the right of access to courts protected by the Florida Constitution. And the ex parte amendments do not unconstitutionally encroach on this Court's rulemaking authority or constitute a prohibited special law. I dissent.

POLSTON and LAWSON, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Statutory Validity

    First District - Case No. 1D14-3178

    (Escambia County)

Virginia M. Buchanan of Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., Pensacola, Florida; Robert S. Peck of Center for Constitutional Litigation, P.C., Fairfax Station, Virginia,

    for Petitioner

Mark Hicks and Erik P. Bartenhagen of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, Florida,

    for Respondent

Philip M. Burlington and Adam J. Richardson of Burlington & Rockenbach, P.A., West Palm Beach, Florida,

    for Amicus Curiae Florida Justice Association

Pamela Jo Bondi, Attorney General, and Jordan E. Pratt, Deputy Solicitor General, Office of the Attorney General, Tallahassee, Florida,

    for Amicus Curiae State of Florida

Andrew S. Bolin of Beytin, McLaughlin, McLaughlin, O'Hara, Bocchino & Bolin, P.A., Tampa, Florida,

    for Amici Curiae Florida Hospital Association, The Florida Medical Association, and The American Medical Association

Mark K. Delegal and Tiffany A. Roddenberry of Holland & Knight LLP, Tallahassee, Florida; and William W. Large, Esq. of Florida Justice Reform Institute, Tallahassee, Florida,

    for Amicus Curiae The Florida Justice Reform Institute